# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 7, 2014          Decided June 23, 2015

No. 13-3041

UNITED STATES OF AMERICA,
APPELLEE

v.

CALEB GRAY-BURRISS,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cr-00178-1)

---

*Steven M. Klepper*, appointed by the court, and *Alexander M. Krischik*, Student Counsel, argued the cause for appellant. With them on the briefs were *Stephen L. Braga*, and Student Counsel, *Michael Baker*, *John Gunter*, *Stewart Inman*, and *Benjamin Wood*.

*Vincent J. Falvo Jr.*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief was *Tracee J. Plowell*, Attorney.

Before: GARLAND, *Chief Judge*, GRIFFITH, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* GARLAND.

GARLAND, *Chief Judge*: Defendant Caleb Gray-Burriss was convicted of fraud and embezzlement in connection with his management of a union of private security guards. On appeal, Gray-Burriss argues that the district court erred in excluding two defense exhibits at trial, that his attorneys labored under a conflict of interest, and that the attorneys provided ineffective assistance. We conclude that it was error to exclude one of the defense exhibits and remand for the district court to determine whether that additional evidence affects Gray-Burriss' sentence. Although we reject the defendant's conflict-of-interest theory, we follow this circuit's usual practice and remand most of his ineffective assistance claims for initial determination by the district court.

I

Gray-Burriss founded the National Association of Special Police and Security Officers (NASPSO) in the 1990s. The union represents private security officers who work in federal buildings. At various times, Gray-Burriss served as its executive director, secretary-treasurer, and president. In June 2010, a grand jury returned an indictment charging Gray-Burriss with mail fraud. In April 2011, the grand jury returned a superseding indictment. And in August 2012, the grand jury returned a second superseding indictment, this time charging the defendant with nineteen counts of mail fraud, embezzlement, and related offenses. The gravamen of the indictment alleged two distinct schemes to steal from the union and its members.

The first scheme, set forth in Counts 1-6, charged Gray-Burriss with mail fraud in connection with benefits plans that NASPSO purportedly established for its members. In several instances, NASPSO negotiated agreements that required private

security companies to make contributions to a NASPSO-sponsored health or retirement plan. The indictment charged the defendant with receiving the employers' payments, depositing them in an ordinary checking account -- keeping no records of what individual members had earned -- and then writing checks on the account to himself, to cash, and to cover the union's operating expenses. These criminal charges stemmed from essentially the same conduct that the Department of Labor charged in a civil suit against Gray-Burriss in 2006. In that proceeding, Gray-Burriss agreed to a consent judgment that obligated him to restore $115,000 in diverted funds and permanently barred him from exercising any control over an employee benefit plan. Consent Judgment, *Chao v. Gray-Burriss*, No. 06-1382 (D.D.C. Apr. 17, 2007).

The second set of charges, set forth in Counts 7-12, alleged various forms of embezzlement from the union's funds, totaling $203,000. The allegations most central to this appeal concern unauthorized salary increases.

Count 8 charged unauthorized payments to Gray-Burriss himself. As of July 1, 2007, Gray-Burriss was earning a salary of $55,000 for his work as the union's executive director, based on a signed employment agreement with the union. In February 2008, he sought a salary increase from the union's executive board. The prosecution alleged that, when his request was rebuffed, Gray-Burriss secretly directed Paychex Corporation -- the firm that processed the union's payroll -- to increase his salary payments. Count 8 charged that by increasing his salary in July 2008, and then again in October 2009, Gray-Burriss

collected $29,000 in unauthorized salary[1] before a new and valid employment agreement was finally adopted in April 2011.

Count 12 of the indictment alleged similar wrongdoing with respect to salary payments made to Gaby Fraser, another union employee. NASPSO hired Fraser in September 2011 at a rate of $45 per hour. On October 15, the union's executive board signed an employment agreement authorizing that rate. Just a few days later, however, Gray-Burriss instead allegedly directed Paychex to pay Fraser $2,925 semi-monthly, equivalent to a $70,200 annual salary. Gray-Burriss was charged with embezzling all of the money paid to Fraser under that substituted salary arrangement, amounting to some $43,000.

The remaining counts, Counts 13-19, charged Gray-Burriss with criminal contempt for violating the terms of the 2007 civil judgment, destruction of subpoenaed records, conspiracy, witness tampering, and union record-keeping violations.

The trial unfolded over four weeks in November 2012. At its conclusion, the jury found Gray-Burriss guilty of eighteen of the nineteen counts; it acquitted him only of tampering with a witness in connection with the grand jury investigation. In April 2013, the court sentenced Gray-Burriss to 76 months' imprisonment and ordered restitution and forfeiture in the amount of roughly $252,000 each, with an open-ended credit toward the restitution obligation for money already repaid pursuant to the earlier civil judgment.

On appeal, Gray-Burriss challenges the district court's exclusion of two documents from the evidence at trial. He

---

[1]Count 8 also charged other payments, such as a duplicate paycheck and unauthorized bonuses, that are not included in this figure.

further contends that his attorneys had a conflict of interest and that they provided ineffective assistance. We address the evidentiary contentions in Parts II and III, and the conflict-of-interest and ineffectiveness claims in Part IV.

## II

Gray-Burriss argues that the district court erred in excluding two employment contracts that he offered as defense exhibits. In this part we address the exclusion of the defendant's 2009 employment contract. We conclude that the exclusion was error; that the error was harmless as to Gray-Burriss' convictions; but that we must remand the case for resentencing because the contract may have influenced the defendant's sentence, including the amount of his restitution and forfeiture obligations.

## A

In September 2010, shortly after Gray-Burriss was first indicted on the mail fraud charges, the grand jury subpoenaed union records from NASPSO and from John Tresvant, a union board member. When no one complied, the district court entered a compulsion order against both NASPSO and Tresvant. After the prosecution moved to hold Tresvant in contempt, Gray-Burriss produced three rounds of documents to the grand jury. In March 2011, the defendant confirmed on the record that those were all the responsive documents.

In May and June 2012, a succeeding grand jury issued new subpoenas for any additional responsive records. The district court entered a new compulsion order, and Wanda Gibbs, then the union's secretary-treasurer, produced additional documents in August 2012. The grand jury returned the final indictment shortly thereafter.

Rule 16(a) of the Federal Rules of Criminal Procedure requires the government, upon the defendant's request, to disclose various discovery materials before trial. The government provided those materials after each of the three successive indictments, beginning in July 2010. *See United States v. Gray-Burriss*, No. 10-178, 2012 WL 5195997, at *1 n.2 (D.D.C. Oct. 19, 2012). Pursuant to Rule 16(b), the government requested reciprocal discovery from the defendant of material within his possession that he intended to use in his case-in-chief at trial. *See* FED. R. CRIM. P. 16(b)(1)(A). In December 2011, the government informed the court that Gray-Burriss had "not provided the Government with a single piece of paper or other discovery item in this case" and sought an order compelling production. Gov. Consol. Mot. in Limine at 20 (12/16/2011). Gray-Burriss' counsel, Heather Shaner, acknowledged that she had "not produced any exhibits" and affirmed that she would "disclose them at such time that I have them." 3/14/2012 Tr. at 76. The judge said he would "hold [her] to that promise." *Id.*

In August 2012, the prosecution again "renew[ed] [its] demand for discovery under Rule 16." 8/28/2012 Tr. at 13. Shaner's co-counsel, Patrick Christmas, responded that he "did not know that no discovery had been provided," that the government's "point is well taken," and that he did not expect the defense to have any discovery to offer beyond the material that the government itself produced. *Id.* at 14. On September 6, 2012, the parties confirmed that the government completed its final production of discovery materials related to the second superseding indictment. 9/6/2012 Tr. at 3.

One of the disputed issues at trial was whether the union's executive board authorized an increase in Gray-Burriss' salary in July 2009. Among the records produced to the grand jury, the government found an unsigned agreement providing for a $75,000 salary effective July 1, 2009, which it included on its

exhibit list and used at trial. Tresvant, a government witness, and Gregory Tyree, a defense witness, each testified to signing that contract on the union's behalf. But two other members of the union leadership, Gibbs and Shavonya Munford, testified that they were unsure whether the agreement had ever been signed. The government's investigator also testified that, as far as his investigation disclosed, "[t]here was no signed agreement in 2009." 11/19/2012 Tr. at 141.

In fact, the defense had a copy of the same July 2009 agreement, but its version was signed by Tresvant, Tyree, Gibbs, and a fourth union member. The government first learned of the document during the second week of the trial, when Christmas attempted to confront a government witness with it. After a brief investigation, the government learned from Paychex that Gray-Burriss had sent the signed contract to the company in the fall of 2009, as purported documentation of a raise, and that Gray-Burriss had asked Paychex to send a copy back to him during the trial. At various points in the government's case, the defense tried to use the exhibit to cross-examine the government's witnesses. The government objected each time that Gray-Burriss had not produced the signed contract either in discovery or pursuant to the grand jury subpoenas. After a series of colloquies spread over several days, the court ultimately ruled that the signed contract could "not be used for any purpose." 11/20/2012 Tr. at 117.

B

Rule 16(d)(2) provides that, "[i]f a party fails to comply with this rule, the court may: (A) order that party to permit the discovery or inspection . . . ; (B) grant a continuance; (C) prohibit that party from introducing the undisclosed evidence; or (D) enter any other order that is just under the circumstances." FED. R. CRIM. P. 16(d)(2). "The district court

has wide discretion in imposing a sanction if it finds that Rule 16 has been violated," *United States v. Marshall*, 132 F.3d 63, 69 (D.C. Cir. 1998); *see United States v. Day*, 524 F.3d 1361, 1372 (D.C. Cir. 2008), and we review its decision to impose a particular sanction only for abuse of discretion, *United States v. Sayan*, 968 F.2d 55, 63 (D.C. Cir. 1992).

Nonetheless, our cases have identified certain important considerations to guide the court's exercise of its discretion. Most relevant here, "although Rule 16 gives trial judges the option of suppressing evidence as a result of [a party's] discovery violations, such a severe sanction would seldom be appropriate where . . . the trial court finds that [the party's] violation did not result from its bad faith and that a less drastic remedy (such as a continuance) will mitigate any unfair prejudice." *Marshall*, 132 F.3d at 70. This does not mean that exclusion is always unwarranted in the absence of bad faith or the presence of less drastic alternatives. *See United States v. Johnson*, 970 F.2d 907, 911 (D.C. Cir. 1992); *Day*, 524 F.3d at 1372. Exclusion is "inappropriate," however, when it would "subvert[] one of Rule 16's goals: 'contributing to an accurate determination of the issue of guilt or innocence.'" *Marshall*, 132 F.3d at 70 (quoting FED. R. CRIM. P. 16, advisory committee note to 1974 amendment).

In this case, the combined weight of several factors persuades us that excluding the 2009 contract was too severe a sanction.

First, the contract was potentially a significant piece of exculpatory evidence. Gray-Burriss was charged with embezzling the very salary payments that the disputed document purported to authorize. We say "purported" advisedly, for the government argues that the people who signed the contract were not legitimate members of the executive board at the time, and

therefore could not have authorized an increase in Gray-Burriss' salary in any event. Perhaps so; but there is no indication that the jury either did or would have agreed with the government on this point. Gray-Burriss' defense to the embezzlement charges at issue would have been considerably strengthened by proof of an executed agreement -- signed by four union leaders -- increasing his salary. Thus, even the government concedes on appeal that the exhibit was "potentially" exculpatory as to the salary payments within its scope. Oral Arg. Recording 46:04-10.

Second, the government has not identified any prejudice it would have suffered from the defense's use of the exhibit. The government has not, for example, disputed the authenticity of the document. After the document emerged, the prosecution had several days to investigate its provenance and raise any such concerns. Upon conducting that investigation, the government argued that the defense exhibit was "not authentic" only in the sense that it omitted a cover page that Gray-Burriss included when he faxed the contract to Paychex in 2009. 11/19/2012 Tr. at 288. But the government did not question that the contract itself was what it purported to be, or that it had been signed by the people who appeared to have signed it. (Nor does it question the document's authenticity on appeal. *See* Oral. Arg. Recording 44:11-26.) Therefore, "[o]ne of the purposes of the discovery rule" -- "to minimize the risk that fabricated testimony will be believed" -- was not implicated here. *Taylor v. Illinois*, 484 U.S. 400, 413 (1988).

Nor did the government identify any other respect in which the late appearance of the document threatened to undercut the prosecution unfairly. To the contrary, the government essentially conceded that there was no prejudice. On Thursday, November 15, 2012, the court advised that it would "hear arguments, if necessary," about "prejudice to the government."

11/15/2012 Tr. at 106. The court scheduled the arguments to take place after the upcoming long weekend, thus affording the prosecutors time for "any further investigation they might need to do," including "the kind of stuff they would have been able to do had they been timely given it." *Id.* After the weekend, the prosecutors made clear that they were upset by the defense's conduct. 11/19/2012 Tr. at 315. But they never identified any way in which permitting use of the document would improperly prejudice their case. *See id.*; *cf. Marshall*, 132 F.3d at 70 ("Because the court deferred its ruling on the admissibility of the . . . records during its adjournment period, the defense received what amounted to a four-day continuance to ponder how it would confront that evidence. Ordinarily, a continuance is the preferred sanction for a discovery delay because it gives the [party] time to alleviate any prejudice it may have suffered from the late disclosure.").

Third, the district court did not find that the defense withheld the disputed contract in bad faith, either from the grand jury or in reciprocal discovery before trial. Rather, the court said it accepted Shaner's "word as an officer of the court" that any violation of Rule 16 "was not willful, wasn't intentional." 11/15/2012 Tr. at 100. Although a finding of bad faith is not a necessary precondition for exclusion, *see Day*, 526 F.3d at 1372, the lack of such a finding takes on greater significance when, as here, the evidence is exculpatory on its face and there is no showing of prejudice.

Finally, although we have analyzed the exclusion in terms of the factors familiar from our Rule 16 cases, we have some doubt as to whether the district court's decision was an exercise of discretion under Rule 16 at all. Rule 16 requires the defendant, having secured disclosure from the government, to disclose in turn certain items that "the defendant intends to use . . . in the defendant's case-in-chief at trial." FED. R. CRIM. P.

16(b)(1)(A)(ii). Here, however, the court barred the defense from using the excluded contract "for any purpose," including impeachment and refreshing a witness' recollection during the *government's* case-in-chief. 11/20/2012 Tr. at 117. Thus, the sanction reached uses of the evidence that may not have triggered a reciprocal discovery obligation under Rule 16 in the first place.[2]

Moreover, although the parties argued Rule 16 extensively to the district court, the court ultimately cited the 2010 grand jury subpoenas and supporting compulsion order as the principal grounds for its ruling. 11/20/2012 Tr. at 117-18. Whether or not the district court had inherent power to sanction grand jury subpoena violations through exclusion of trial evidence in an appropriate case, *cf.* FED. R. CRIM. P. 17(g) (authorizing the court to hold in contempt a witness who disobeys a subpoena), the necessary predicate for such a sanction was not established here, for the following reasons. The district court found only "a prima facie case" that the 2009 contract was withheld in violation of the grand jury subpoenas and compulsion order. 11/20/2012 Tr. at 117. Even if the document "was in the defendant's possession or at least NASPSO's possession in 2009," as the court inferred, *id.* at 118, that was still roughly a year before the first subpoenas issued to NASPSO and Tresvant,

---

[2] *See, e.g.*, *United States v. Medearis*, 380 F.3d 1049, 1057 (8th Cir. 2004) (holding that a document used only for impeachment is not excludable under Rule 16); *United States v. Moore*, 208 F.3d 577, 579 (7th Cir. 2000) (same); *cf. United States v. Young*, 248 F.3d 260, 269 (4th Cir. 2001) (affirming exclusion because the party "*intended* to offer the tapes not for impeachment purposes, but as 'evidence in chief'"); *United States v. King*, 703 F.2d 119, 126 n.6 (5th Cir. 1983) (affirming exclusion and noting that, "even though the documents were excluded from evidence, . . . [d]efense counsel was allowed to use the documents to refresh the recollection of witnesses").

*see* Gov. Ex. 108 (Tresvant subpoena); Gov. Ex. 109 (NASPSO subpoena).  The court did not find that the document was still in the possession of the defendant or NASPSO (which the defendant allegedly controlled) when the latter received a grand jury subpoena, much less that the defendant knowingly withheld it from the materials he furnished in response.  Moreover, the government's investigation only determined that Gray-Burriss obtained a copy of the document from Paychex during the trial.  *See* 11/19/2012 Tr. at 280-83.  In short, given the sparse record and the absence of prejudice or bad faith, the objective of vindicating the grand jury subpoenas did not suffice to justify excluding this potentially exculpatory document.

C

Although we conclude that the district court erroneously excluded the July 2009 employment contract, that is not the end of the matter.  Even when evidence is erroneously excluded, "[a]ny error . . . that does not affect substantial rights must be disregarded."  FED. R. CRIM. P. 52(a); *see United States v. Olano*, 507 U.S. 725, 734 (1993); *see also* FED. R. EVID. 103(a).  A nonconstitutional error (such as the error alleged here) is subject to reversal under this standard "'if one cannot say, with fair assurance, . . . that the judgment was not substantially swayed by the error.'"  *United States v. Palmera Pineda*, 592 F.3d 199, 200 (D.C. Cir. 2010) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)); *see, e.g.*, *United States v. Bailey*, 319 F.3d 514, 519 (D.C. Cir. 2003).  Because Gray-Burriss objected to the exclusion at trial, the government bears the burden of proving harmlessness.  *See Olano*, 507 U.S. at 734.

It is clear that the error was harmless with respect to Gray-Burriss' conviction.  Count 8 charged Gray-Burriss with embezzlement from the union through many separate

transactions (checks). *See* Second Superceding Indictment at 9-13. The verdict sheet listed each transaction, and the jury unanimously agreed that Gray-Burriss was guilty of virtually all of them -- including twenty-three that took place before the July 1, 2009 effective date of the contract. Verdict Form at 2-7; *see* Def. Ex. 5 (2009 employment contract). Gray-Burriss concedes that the contract did not authorize transactions that predated it. *See* Oral Arg. Recording 10:37-48. And, as the court instructed the jury without objection, a guilty verdict required unanimous agreement on only a single transaction for each count. *See* 11/27/2012 Tr. at 231. Although Gray-Burriss suggests that the jury's judgment as to the post-July 1 transactions could have affected its appraisal of the twenty-three pre-July transactions, that possibility is too remote to disturb our confidence in the jury's verdict. *See, e.g.*, *United States v. Bishop*, 469 F.3d 896, 904 (10th Cir. 2006) (finding harmless error where the verdict form indicated unanimous agreement with respect to another charged act that was independently sufficient for the same count of the indictment), *abrogated on other grounds by Gall v. United States*, 552 U.S. 38 (2007). And the possibility that this limited error infected the other counts of the indictment, none of which related to the employment contract, is even more speculative.

We cannot, however, be confident that exclusion of the 2009 contract was harmless with respect to Gray-Burriss' sentence. The amounts the government charged as theft (and found to be such by the jury) were premised on the assumption that Gray-Burriss was authorized to receive only a $55,000 annual salary, not a $75,000 salary, during the period from July 2009 to April 2011. *See* 11/14/2012 Tr. at 33-35 (Michel Test.); Gov. Ex. 212. If the sentencing court had considered the 2009 contract -- and if, in doing so, the court had considered it to validly authorize an increase in salary -- the court might well have arrived at a lower loss finding and significantly reduced the

defendant's restitution and forfeiture obligations. Accordingly, we will remand the case to the district court to determine whether adding this piece of evidence into the mix leads it to a different conclusion with respect to the restitution and forfeiture components of Gray-Burriss' sentence. At the same time, of course, the district court may determine whether, in its discretion, any lower loss finding should affect the defendant's term of incarceration.[3]

## III

In addition to excluding Gray-Burriss' July 2009 employment contract, the district court also excluded an October 2011 employment contract for Gaby Fraser on essentially the same grounds. That signed agreement, dated October 15, 2011, authorized payment to Fraser at a rate of $45 per hour for various services. The court accepted the government's contention that the contract was a "payroll record" within the scope of the grand jury subpoena issued in June 2012, and it barred the defense from making use of the document because it was not produced to the grand jury or the government.

We do not need to consider whether excluding Fraser's 2011 employment contract was error, however, because it is clear that any error was harmless in all respects. Although the court barred the defense from using the October 2011 contract,

---

[3]We note that it does not appear that a lower loss finding would change the defendant's Sentencing Guidelines range. Even the sum of all the thefts the jury found in Count 8 ($35,680) is less than the difference between the court's overall loss finding ($252,276) and the next-lowest threshold for a loss enhancement under the Guidelines ($200,000). *See* Verdict Form at 2-7; Presentence Investigation Report ¶ 86a; 4/8/2013 Tr. at 44 (accepting the Report's findings); U.S.S.G. § 2B1.1(b)(1).

the contract's existence was established and never disputed at trial. Indeed, it was the premise of the government's case on Count 12: that, although Fraser had a $45 per hour contract, Gray-Burriss improperly shifted her to an unauthorized $70,000 annual salary. The prosecution elicited from Tresvant both that Fraser was hired in September 2011 at $45 per hour and that a formal agreement to that effect was signed on October 15. For its part, the defense called April Richardson, another executive board member, who also testified to signing a $45 per hour contract for Fraser in October 2011. Tyree said the same during the government's cross-examination. And the government reminded the jury of the October 15 agreement in its own closing argument:

> Now we have the infamous day, October 15th, 2011. What the testimony was, was we signed an agreement with [Fraser] for $45 an hour. . . . They think she's getting $45 an hour for every hour she works. In fact, as the Paychex records show, she was getting over $70,000 in a salary.

11/28/2012 Tr. at 38-39. Accordingly, because introduction of the 2011 document itself would have been merely cumulative, any error in its exclusion was at worst harmless. *See, e.g.*, *United States v. Gupta*, 747 F.3d 111, 133-34 (2d Cir. 2014) (finding exclusion of defense evidence harmless because, inter alia, the evidence was "plainly cumulative").

Gray-Burriss suggests that the contract document might not have been cumulative in one respect: it stated that Fraser would receive $45 per hour for at least twenty hours per week (and for a maximum of forty hours). But this provision would not have made a difference. The defense theory on Count 12 was that Gray-Burriss acted in good faith, and, to support that argument, the defendant elicited undisputed testimony that Fraser did

substantial work for the union. *See* 11/27/2012 Tr. at 7-8 (Tyree Test.); 11/21/2012 Tr. at 76-77 (Tresvant Test.). Indeed, the government's own investigator so testified. *See* 11/19/2012 Tr. at 89-90 (Michel Test.). The prosecution theory, by contrast, was that each of the charged salary payments constituted an act of embezzlement because the defendant's decision to put Fraser on salary, only days after the board adopted a different arrangement, was unauthorized and manifested fraudulent intent. The jury adopted the prosecution's view as to each payment notwithstanding the undisputed evidence about Fraser's work. And when the defense moved for a judgment of acquittal on this count, the district court concluded that there was sufficient evidence of embezzlement notwithstanding Fraser's work for the union. *United States v. Gray-Burriss*, No. 10-178, 2013 WL 460220, at *1-2 (D.D.C. Feb. 6, 2013). Whatever its merits, Gray-Burriss has neither appealed that decision nor made any other sufficiency-of-the-evidence argument on appeal.

Nor would the minimum-hours provision have affected the district court's determination of the amount of loss at sentencing. The defense objected to the Presentence Investigation Report's loss calculation on the ground that Fraser had done a great deal of work and "was worth every penny she received." PSR at 40 (objection to ¶¶ 55-62). The district court overruled that objection "for all the reasons that . . . [it] denied the motion for judgment of acquittal on Count 12." 4/8/2013 Tr. at 31; *see Gray-Burriss*, 2013 WL 460220 (D.D.C. Feb. 6, 2013). There is no indication that, in deciding on an appropriate sentence, the court doubted Fraser had a contractual right to be paid on an hourly basis for whatever amount of work she did.

IV

Gray-Burriss also contends that he was denied effective assistance of counsel. In order to succeed on a Sixth Amendment claim of ineffective assistance, a defendant must show two things: (1) "that counsel's performance was deficient," falling "below an objective standard of reasonableness"; and (2) "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). *See United States v. Shabban*, 612 F.3d 693, 697 (D.C. Cir. 2010). In *United States v. Rashad*, we explained that:

> Due to the fact-intensive nature of the *Strickland* inquiry and the likelihood, when a defendant asserts his sixth amendment claim for the first time on direct appeal, that the relevant facts will not be part of the trial record, . . . this court's general practice is to remand the claim for an evidentiary hearing unless the trial record alone conclusively shows that the defendant either is or is not entitled to relief.

331 F.3d 908, 909-10 (D.C. Cir. 2003) (internal quotation marks omitted). *See, e.g.*, *United States v. Pole*, 741 F.3d 120, 126 (D.C. Cir. 2013); *United States v. Fareri*, 712 F.3d 593, 595 (D.C. Cir. 2013); *United States v. Bell*, 708 F.3d 223, 225 (D.C. Cir. 2013).

In subpart A, we address Gray-Burriss' contention that his attorneys had a conflict of interest that adversely affected their representation of him. In subpart B, we briefly address his remaining ineffectiveness contentions.

A

We begin our consideration of Gray-Burriss' conflict-of-interest claim by setting forth the facts that underlie it. We then explain that the claim is not properly analyzed as a conflict of interest issue, but that construed as an ordinary *Strickland* claim, it nonetheless warrants consideration on remand.

1. Heather Shaner was appointed under the Criminal Justice Act (CJA) to represent Gray-Burriss from the outset of his case in June 2010. In July 2012, Gray-Burriss retained attorney Patrick Christmas to represent him as well. Shortly thereafter, Shaner informed the court that Gray-Burriss was "satisfied with his retained counsel" and moved to withdraw from the case. Mot. to Withdraw as Counsel at 1 (8/23/2012). The court asked Christmas if he would feel prepared for the scheduled November trial date if Shaner withdrew; Christmas said he would not, and the court denied Shaner's motion. Christmas also said he would not be prepared in time even with Shaner's help, but the court denied his motion for a continuance. The court then reminded the parties that, pursuant to a pretrial order entered months earlier, they were required to confer and make a joint submission of pretrial materials by October 24.

The government filed its proposals on October 10. On October 17, Christmas again moved to continue the trial date, stating that "a serious injustice will occur if the Defendant is 'forced' to trial on November 2, 2012." Def.'s Renewed Mot. to Continue at 2 (10/17/2012). The court again denied the continuance, citing the long pendency of the case and the "numerous continuances and accommodations" that the court had already granted Gray-Burriss before he retained Christmas. *United States v. Gray-Burriss*, No. 10-178, 2012 WL 5195997, at *1 (D.D.C. Oct. 19, 2012). Although the court recognized that "Christmas may not feel fully prepared," it stressed that

Shaner, "the defendant's CJA counsel from the beginning of the case over 27 months ago, still represents him." *Id.* at *2.

In the days that followed, the defense failed to submit the required pretrial materials and did not take up the government's invitations to discuss its own proposed submissions. On the morning of the October 24 due date for the joint pretrial submission, the prosecution informed the court that it had failed in its efforts to reach Christmas, and that Shaner had merely deferred to Christmas as "lead counsel" (although she, too, had not heard from him). Mot. for Leave to File at 2 (10/24/2012). The court responded that, if these allegations were accurate, "the Court finds both defense counsel's nonfeasance inexcusable." Order to Show Cause at 2 (10/25/2012). It therefore entered an order directing Shaner and Christmas to show cause why they should not be sanctioned and referred for further discipline.

In her response, Shaner contended that Christmas had cut her out of his planning for the case. Nonetheless, she said, she had done "everything reasonably possible within the scope of her authority" to aid Christmas without "usurp[ing]" his role as Gray-Burriss' "lead counsel of choice." Response to Order at 3-4 (10/29/2012). Shaner also secured her own counsel and requested a hearing to address the show-cause order. For his part, Christmas acknowledged that he only recently "began to appreciate the complexity of preparing a professional and proper defense in this matter." Response to Order at 2 (10/31/2012). He had failed to meet the court's deadlines, he said, because he was "literally overwhelmed" with other obligations. *Id.* at 4.

On November 2, as jury selection was set to begin, Shaner noted that her attorneys were present in the courtroom and asked to address the court regarding the show-cause order. When the court declined to take up the show-cause order, Shaner protested:

> Your Honor, I cannot go forward and zealously advocate for my client and I would move to withdraw therefore. I am too upset to go forward with my license, my liberty, my reputation and my livelihood pending, and I am afraid that it will have prejudicial effects on my zealous advocacy and on Mr. Burriss.

11/2/2012 Tr. at 5. The court denied Shaner's motion and reiterated that "[w]e'll take this up after the trial." *Id.* at 6. In a minute order, the court explained that, based on its past experience with Shaner, it "was fully confident that she would not falter in her duty to her client." Minute Order (11/5/2012).[4]

Four weeks later, after closing arguments, Christmas raised the pending show-cause order again, asserting that it "has chilled my representation and that of Ms. Shaner." 11/28/2012 Tr. at 103. The judge agreed to hear from both lawyers. Christmas apologized several times for his failure to comply with the pretrial order, explaining again that he "was just overwhelmed" and "took on too much work." *Id.* at 108-09. He said he thought he could "[p]lay with Your Honor, as far as some of the

---

[4]The minute order stated:

> This court has seen Ms. Shaner under fire before, and she has held her own like the experienced professional that she is. The court was fully confident that she would not falter in her duty to her client. That confidence has been borne out thus far by her usual skilled advocacy during the full day of voir dire that has been completed. Her motion was denied so as not to delay the panel of 65 prospective jurors waiting in the jury office . . . and to bring no further delay to a trial that had been delayed far too long already.

Minute Order (11/5/2012).

rules," and "did not realize . . . that Your Honor makes an order and stays with that order." *Id.* at 112.

Shaner explained that she had struggled to define her role once Gray-Burriss made clear that he wanted to be represented by Christmas and not by her. Christmas confirmed that "everything she says today . . . is true." *Id.* at 124. The court then vacated and discharged the show-cause order, stating that "[a]s far as I'm concerned[,] the matter is over." *Id.* at 125.

2. Gray-Burriss argues that the show-cause order that was left pending during the trial created a conflict of interest, or at least the possibility of one, between his attorneys and himself. As he sees it, Shaner and Christmas were put to a choice between zealously advocating for him (and risking irritating the trial judge) or preparing their own defenses in the show-cause proceeding. Gray-Burriss particularly stresses an apparent last-minute hand-off of the closing argument from Shaner to Christmas -- which in court Christmas attributed to the fact that Shaner's "voice [was] going," 11/28/2012 Tr. at 56 -- and speculates that Shaner was in fact conserving her energy, or the court's goodwill, for the show-cause hearing that took place later that day. *See* Def. Br. 45-46; Reply Br. 18.

Doctrinally, reframing an alleged deficiency in performance in terms of a conflict of interest makes a world of difference. In *Cuyler v. Sullivan*, the Supreme Court held that, if a defendant can show that "a conflict of interest actually affected the adequacy of [the attorney's] representation," he "need not demonstrate prejudice in order to obtain relief." 446 U.S. 335, 349-50 (1980). In those circumstances, when counsel "is burdened by an actual conflict of interest," prejudice "is presumed" and the second prong of *Strickland* does not apply. *Strickland*, 466 U.S. at 692 (citing *Cuyler*, 446 U.S. at 345-50); *see United States v. Gantt*, 140 F.3d 249, 254 (D.C. Cir. 1998).

This court has been careful, however, to reject "defendants' attempts to force their ineffective assistance claims into the 'actual conflict of interest' framework . . . and thereby supplant the strict *Strickland* standard with the far more lenient *Cuyler* test." *United States v. Bruce*, 89 F.3d 886, 893 (D.C. Cir. 1996); *see, e.g.*, *United States v. Taylor*, 139 F.3d 924, 930 (D.C. Cir. 1998); *United States v. Leggett*, 81 F.3d 220, 227 (D.C. Cir. 1996).

When a defendant claims a conflict between himself and his attorney, he must show that the attorney was "forced to make a choice advancing his own interest at the expense of his client's." *Taylor*, 139 F.3d at 930; *see Bruce*, 89 F.3d at 893 (same). The mere fact that a court has threatened an attorney with contempt is insufficient to make that showing. In *United States v. Shark*, for example, the district court complained in open court that defense counsel "doesn't pay any attention to me, . . . and next time I'm going to get his attention and put him in the cell block." 51 F.3d 1072, 1074 (D.C. Cir. 1995). Although the defendant maintained that this threat created a conflict "between the defense counsel's personal interest (to mollify the judge) and that of her client," *id.* at 1075, this court disagreed. "We very much doubt," we said, "that mere fear of rebuke from the court could ever give rise to a conflict of interest sufficient to establish a predicate for ineffective assistance." *Id.* at 1076. Likewise, in *United States v. Taylor*, we rejected a defendant's claim that his trial counsel had a conflict of interest because he faced a possible contempt sanction from the district court. 139 F.3d at 928, 931. "Because all attorneys potentially face contempt citations, no particular attorney can be considered ineffective due to a concern that he or she might be so cited." *Id.* at 932; *see id.* at 930 ("[A] *Cuyler* conflict does not arise from mere

'friction between trial counsel and the court.'" (quoting *Shark*, 51 F.3d at 1076)); *Leggett*, 81 F.3d at 227 (same).[5]

This case readily falls into the category defined by *Shark* and *Taylor*. Nothing about the show-cause order made it different in kind from the circumstances considered in those cases. To the contrary, the order, which criticized Shaner and Christmas for their "nonfeasance," Order to Show Cause at 2 (10/25/2012), gave them every incentive to showcase their most engaged and assiduous lawyering on Gray-Burriss' behalf. *Cf. Leggett*, 81 F.3d at 227 ("[A]n attorney fearing an ineffective assistance of counsel claim has an incentive to do his best, not the contrary."). It did not create a conflict between their personal interests and those of their client.

*United States v. Hurt*, 543 F.2d 162 (D.C. Cir. 1976), upon which Gray-Burriss heavily relies, provides an instructive contrast. In *Hurt*, the defendant's replacement counsel argued that his conviction should be reversed because his trial counsel had provided ineffective assistance. The trial counsel then sued the replacement counsel for libel, seeking $2 million in damages. The lawsuit, we said, created an actual conflict of interest: "[W]hile his client's interest plainly lay in hammering away toward th[e] objective" of showing that "trial counsel's performance was constitutionally inadequate," replacement counsel's "self-interest in not worsening his own position tugged strongly in the opposite direction." *Id.* at 166. Gray-Burriss, by contrast, has identified no self-interest that would have tugged

---

[5]Of course, a judge's hostility may "so hamper counsel's zealous representation as to violate a defendant's right to a fair trial," which "would be independently remediable on those grounds." *Shark*, 51 F.3d at 1076. There was no such extraordinary rebuke here, and the defendant does not contend that there was. *See also supra* note 4 (quoting Minute Order describing Shaner's work favorably).

his attorneys toward being less zealous than required for his defense.

3. Because Gray-Burriss' claim of conflicting courtroom incentives is unwarranted, the *Cuyler* exception to the two-pronged *Strickland* test does not apply. But *Strickland* itself still does. And "if judicial expressions of dissatisfaction were severe enough to lead defense counsel to make decisions that are both objectively deficient and prejudicial, the *Strickland* requirements for showing ineffective assistance would be satisfied." *Shark*, 51 F.3d at 1077.

Viewed through that lens, Gray-Burriss' various allegations of inadequate preparation for trial and closing argument are sufficiently colorable to warrant factual findings on remand. *See Pole*, 741 F.3d at 126 ("In this Circuit, we generally remand colorable claims of ineffective assistance to the district court to make any necessary factual findings, unless the record conclusively demonstrates that the defendant is or is not entitled to relief." (internal quotation marks and citations omitted)). The record before us understandably does not focus on the extent of Shaner's and Christmas' preparation for the trial or for its key moments (such as closing argument). *See Massaro v. United States*, 538 U.S. 500, 504-05 (2003); *Rashad*, 331 F.3d at 911. Gray-Burriss also raises colorable questions about who had planned to give the closing argument in this complex criminal case and whether the argument that Christmas ultimately gave passed muster.

"Like most ineffective-assistance claims raised on direct appeal," these claims "require[] further factual development." *Fareri*, 712 F.3d at 595. We therefore remand for the district court to consider them in the first instance.

B

Gray-Burriss makes several additional claims of ineffective assistance. Those include a claim that his attorneys failed to procure the assistance of a forensic accounting expert to review withdrawals and expenditures for authorization in the union's records. They also include, inter alia, a claim that the attorneys failed to properly raise an advice-of-counsel defense -- either by subpoenaing NASPSO's former general counsel, who Shaner told the court had advised Gray-Burriss that it "was just fine" to transfer money from the union's pension fund to use for operating expenses, 11/26/2012 Tr. at 172; or by satisfying the hearsay rule's requirements for admitting that advice through the testimony of another NASPSO attorney who allegedly was present at the time. Because the record does not "conclusively demonstrate[] that the defendant is or is not entitled to relief" based on Gray-Burriss' various claims, we remand them to the district court to make the necessary findings. *Pole*, 741 F.3d at 126 (internal quotation marks and citations omitted); *see Fareri*, 712 F.3d at 595; *Bell*, 708 F.3d at 225-26.

We do not, however, remand Gray-Burriss's claim that his attorneys' deficient performance led to the exclusion of the two disputed employment contracts discussed in Parts II and III. To establish a *Strickland* claim, a defendant must show both that there was a deficiency in his attorneys' performance and that the deficiency was prejudicial. *See Strickland*, 466 U.S. at 694. To the extent that the government has carried its burden to prove that the exclusions were harmless (entirely with respect to the 2011 contract, and insofar as Gray-Burriss' conviction is concerned with respect to the 2009 contract), it follows a fortiori that Gray-Burriss cannot prove the same exclusions were prejudicial. *See United States v. Cassell*, 530 F.3d 1009, 1018 (D.C. Cir. 2008) (explaining that "the harmless error standard of review" is "more favorable to the defendant than the prejudice

prong of *Strickland*").  And to the extent that we have concluded the exclusion of the 2009 contract was *not* necessarily harmless (with respect to Gray-Burriss' sentence), we are already remanding for the district court to reconsider the sentence in light of the contract.  Such reconsideration will render harmless any ineffectiveness of counsel that contributed to that error.

V

For the foregoing reasons, we remand this case for the district court to reconsider Gray-Burriss' sentence in light of the excluded  2009 employment contract, and to consider Gray-Burriss' colorable ineffective assistance claims.  In all other respects, we affirm the judgment of the district court.

*So ordered.*